UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SABIC YOUSEF, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> CAPITAL ONE SERVICES, INC., <br> CAPITAL ONE FINANCIAL CORP., <br> CAPITAL ONE, N.A., JAMES <br> COVINGTON, JOHN DOES 1-10, AND <br> XYZ CORP, 1-10 : <br> : <br> Defendants. : | Hon. Dennis M. Cavanaugh <br><br> **OPINION** <br><br> Civil Action No: 11-cv-1687(DMC)(MF) |

DENNIS M. CAVANAUGH, U.S.D.J.:

This matter comes before the Court upon motion by Capital One Services' ("COS")("Defendant") to dismiss the complaint of Sabit Yousef ("Plaintiff") pursuant to Fed.R.Civ.P. 12(b)(6). After carefully considering the submissions of the parties, and based upon the following, it is the finding of this Court that COS' motion will be **granted** in part, and the case will be **remanded** to State Court for further proceedings not inconsistent with this Opinion.

I.   **BACKGROUND**

Plaintiff began working at the Trust Company of New Jersey in or about March of 1994. (Pl.'s Compl. ¶ 17). Plaintiff initially served as Assistant Vice President of Middle Eastern Affairs and was later promoted to Vice President of Middle Eastern Community affairs in or

about 2000. Id. During his employment with Trust Company, Plaintiff's supervisor characterized his production as "nothing short of spectacular" and described Plaintiff as " hardworking and dedicated to doing the best job." (Aff. of Sabit Yousef, Ex. A). When Trust Company was acquired by North Fork Bancorporation, Inc. ("North Fork") in 2004, Plaintiff received a written confirmation that he was to continue working for North Fork, serving as its Director of Middle Eastern Community Affairs. Id. at ¶ 21-22. Shortly thereafter, in or about 2005, Plaintiff was transferred to North Fork's Private Banking Sector to serve as its Vice President of Private Banking. Id. at ¶ 23.

In 2006, Capital One Financial Corporation acquired North Fork and promoted Plaintiff to the position of Vice President. Id. at ¶ 26. On December 8, 2008, Capital One provided Plaintiff with a notice of termination letter ("termination notice"), informing him that he was being "placed into employment transition for a sixty day period" and that his employment would end on February 5, 2009. (Br. in Supp. of Defs.' Mot. to Dismiss at 2).

On December 9, 2008, Plaintiff received an email from Defendant Covington that instructed him to "work with Jon Trombley to transition [Plaintiff's] clients and prospects into [Trombley's] sales and service force."(Aff. of Sabit Yousef, Ex. H). Jon Trombley, who is described as being both younger than Plaintiff and not of Middle Eastern descent, was the Executive Vice President of Capital One. (Pl.'s Compl. ¶ 47). On February 19, 2009, in consideration for twelve months "Severance Pay," Plaintiff executed a Letter of Agreement ("LOA") to "fully release and forever discharge (Capital One) . . . from any and all claims . . ."

which included, " . . . all claims arising under or relating to employment . . ." (Aff. of Sabit Yousef, Ex. I ¶ 16).

       Plaintiff filed this complaint on February 1, 2011, in the Superior Court of New Jersey. On April 12, 2011, complaint was removed by Defendants to United States District Court for the District of New Jersey. Plaintiff alleges that he is the victim of unlawful discrimination, harassment, wrongful termination and unjust enrichment under the New Jersey Law Against Discrimination. Plaintiff names as Defendants in this matter Capital One Services, Inc., Capital Once Financial Corp., Capital One, N.A., and James Covington. (Pl.'s Compl. at 1). Plaintiff seeks damages for lost wages and retirement benefits, as well as unpaid vacation and personal days allegedly owed to him. (Pl.'s Compl. at 11). Additionally, Plaintiff seeks damages for the emotional distress and mental anguish he suffered as a result of the Defendants' allegedly discriminatory conduct. (Pl.'s Compl. at 10).

**II.     LEGAL STANDARD**

       A. Under the New Jersey Law Against Discrimination ("LAD"):

It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination:

> For an employer, because of the race, creed, color, national origin, ancestry, age, marital status, civil union status, domestic partnership status, affectional or sexual orientation, genetic information, sex, gender identity or expression, disability or atypical hereditary cellular or blood trait of any individual, or because of the liability for service in the Armed Forces of the United States or the nationality of any individual, or because of the refusal to submit to a genetic test or make available the results of a genetic test to an employer, to refuse to hire or employ or to bar or to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. . .

N.J.S.A. 10:5-12, (2008)

B. Fed. R. Civ. P. 12(b)(6)

"The [d]istrict [c]ourt, in deciding a motion under Fed. R. Civ. P. 12(b)(6), [is] required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [Plaintiff]." Phillips v. County of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [ ] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[A court is] not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986). "Factual allegations must be enough to raise a right to relief above a speculative level, [ ] on the assumption that all factual allegations in the complaint are true (even if doubtful in fact)." Bell at 555-56. The Complaint must set forth direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory. Bell, 550 U.S. at 562. That said, something more than a mere *possibility* of a claim must be alleged; the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face." Id. at 570.

**III.   DISCUSSION**

A. Waiver

Defendants argue that Plaintiff waived his right to bring any and all claims against COS after he "knowingly and willfully" executed the Letter of Agreement ("LOA') on February 19,

2009. (Reply Br. in Supp. of Defs.' Mot. to Dismiss at 6). Defendants point to the explicit language provided in Section 16 of the LOA which releases Defendants from claims "arising from or relating to [Plaintiff's] employment with [Capital One] and any of its affiliates or the termination of that employment, or any circumstances related thereto, or any other matter, cause or thing whatsoever." (Aff. of Sabit Yousef, Ex. I ¶ 16). Plaintiff contests the assertion that he signed the release 'knowingly and voluntarily,' and argues that while he may be barred from resurrecting claims he had against COS at the time the LOA was executed, he is not precluded from bringing "future claims that arise after the execution of [the] agreement." (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss at 12).

The test used to determine whether or not the release of an LAD claim is valid is grounded in the analysis that has been applied to claims arising under Title VII 42 U.S.C.§ 2000 et. seq., which seeks to ensure that the waiver was made "knowingly and willfully." Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir. 1988). The Third Circuit has adopted the "totality of the circumstances test" in order to determine whether claims have been waived "knowingly and willfully." Martinez v. National Broadcasting Co., 877 F. Supp. 219 (D.N.J. 1994) (citing Coventry, 856 F.2d at 521-525. The analysis incorporates a variety of factors, which include

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

Moroni v. Penwest Pharmaceuticals Co., No. 07-5546, 2009 WL 3335504 *5 (D.N.J Oct. 13, 2009)

Upon review of the facts, the Court finds that the Plaintiff's voluntary execution of the LOA satisfies the "totality of the circumstances" test, and results in a "knowing and willful" release of Plaintiff's claims against Defendant

1. *Clarity and Specificity of the LOA*

Under the 'totality of circumstances test,' the Defendants correctly argue that the language provided in the LOA is clear and unambiguous. Section 16 of the LOA provides in pertinent part:

> In consideration of the payments and other consideration provided for in this Agreement , that being good and valuable consideration, in addition to anything of value to which you are already entitled from CONA, the receipt, adequacy and sufficiency of which are acknowledged by you, you, for yourself and your agents, administrators, representatives executor, successors, heirs, devisees and assigns (collectively, the "Releasing Parties"), do hereby **fully release and forever discharge CONA and its past, present and future parent, subsidiary and affiliate corporations, organizations, and entities** (emphasis added) . . . from any and all claims, rights, demands, debts, obligations, losses, causes of action, actions, suites, controversies, setoffs, affirmative defenses, counterclaims, third party actions, damages, penalties, costs, expense, attorney's fees, liabilities and indemnities of any kind or nature whatsoever, whether known or unknown, suspeected or unsuspected, accrued or unaccrued, contingent or actual, whether at law , equity, administrative, statutory or otherwise, and whether for injunctive relief, back pay, fringe benefits, reinstatement , reemployment , or **compensatory, punitive or any other kind of relief or damages, which any of the Releasing Parties ever have had in the past or presently have against the Released Parties, and each of them, arising from or relating to your employment with CONA and any of its affiliates or the termination of that employment or any circumstances related thereto, or any other matter, cause or this whatsoever**. (emphasis added) (Aff. of Jennie Chenault, Ex. A ¶ 16)

The LOA further specifies in Section 16, that Plaintiff waives:

> all claims arising under or relating to employment, employment contracts, employee benefits or purported employment discrimination or violations of civil rights of whatever kind or nature, including without limitation, all claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights

>Act of 1866 and/or 1871, 42 U.S.C. § 1981, the Americans With Disabilities Act of
>1990, the Age Discrimination in Employment Act ("ADEA") . . . (Id. at 5).

The Court finds that the language of the LOA provided the Plaintiff with a clear, thorough, and definitive explanation as to what claims were released in consideration for the twelve months severance pay he received. Plaintiff misinterprets the straightforward language in Section 16 of the LOA by asserting his right to sue COS for "future claims that arise after the execution of the agreement." (Pl.'s Opp'n. to Defs.' Mot. to Dismiss at 12). Plaintiff's attempt to circumvent the plain language and conditions of the LOA by claiming to have been unaware of claims he may have had against COS at the time the waiver was executed is unavailing. A claim accrues in a Federal cause of action upon awareness of actual injury, not upon awareness that [the] injury constitutes a legal wrong." (Wastak v. Lehigh Valley Health Network, 342 F.3d 281, 287 (3rd. Cir. 2003) (citing Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380,1386 (3d Cir. 1994).

In Wastak, after receiving notice of termination, Plaintiff executed a waiver agreement that released his employer from all claims under "Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (29. U.S.C. § 6210), Section 1981 of the Civil Rights Act of 1866, the Equal Pay Act of 1963, the Rehabilitation Act of 1973 and Civil Rights Act of 1991, Pennsylvania Human Relations Act, Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq., and any other state or federal equal employment opportunity law or statute." Wastak, 342 F.3d at 284. The plaintiff, who was fifty-eight at the time he was released, discovered that his employer had replaced him with a forty-two year old women nine months after he was terminated. Id. at 285. The plaintiff subsequently filed a charge of age discrimination

with the Equal Employment Opportunity Commission, arguing that his claim did not arise until after he learned of his younger replacement. Id. at 286-287. The Third Circuit rejected the plaintiff's argument, holding that the plaintiff's injury "was complete and discovered" the moment he was terminated and that his claims were precluded by the conditions of the signed release because they arose after the execution of the agreement. Id.

Much like the plaintiff in Wastak, Plaintiff in the present action unsuccessfully argues that it was not until he sought the advice of counsel that he was made aware of the potential claims he had against COS. (Pl.'s Compl. ¶ 59). Plaintiff acknowledges that immediately after receiving the termination notice on December 8, 2008, DefendantCovington e-mailed Plaintiff's successor with instructions to gather necessary information regarding Plaintiff's client base. (See Aff. of Sabit Yousef, Ex. H). According to Plaintiff, on December 9, 2008, Plaintiff received an additional e-mail from Covington requesting that he "work with Jon Trombley to transition [Plaintiff's] clients and prospects into [Jon Trombley's} sales force." (Pl.'s Compl. ¶ 46). In light of Covington's repeated requests to transfer client information coupled with Plaintiff's receipt of the termination notice, the Court finds that Plaintiff was or should have been aware of claims he may have had against Defendant at the time he executed the LOA. Not only was Plaintiff notified that he was to remain in a "transition period" until termination, but Plaintiff was also aware that his replacement was younger and was not of middle eastern descent. This Court finds that the language of the LOA was both clear and specific, and thus satisfies the first prong of the "totality of circumstances test."

2. *Education and Business Experience*

The Court finds that the Plaintiff had sufficient education and business experience to understand and execute the release. Sauter v. Federal Home Loan Bank of NY, No. 08-899, 2009 U.S.Dist. LEXIS 68817, * 3 (August 5, 2009). Courts generally view persons with college educations, professional degrees, business experience, or some combination thereof, as having the requisite "education and experience" to understand such a release. Id. at *3 (see Cirillo v. Arco Chem. Co., 862 F.2d 448, 453 (3d Cir. 1988)). Plaintiff has presented evidence that suggests his performance as Vice President of Middle Eastern affairs was nothing short of exemplary and provides numerous statements and testimonials from co-workers that support this assertion. Despite the fact the Plaintiff is not a lawyer, given Plaintiff's high ranking position with COS and his years of experience handling complex financial transactions, the Court finds that Plaintiff possessed the requisite amount of business acumen and professional sophistication to comprehend the language of the release. (Sauter, at 4.)

  3. *Time to Consider Whether to Sign Release*

While the Third Circuit has yet to define the appropriate length of time necessary for employees to deliberate the terms of a waiver agreement, in Cuchara v. Gai-Tronics Corp., 129 Fed App'x 728, 731 (3d.Cir. 2005) the Court held that twenty-one days was enough time for an employee to contemplate whether to sign a release. According to the Plaintiff, COS provided him with the LOA in December of 2008. (Pl.'s Compl. at ¶ 54.). However, Defendants point out that Plaintiff waited nearly two months to sign the LOA, and did not do so until February of 19, 2009. (Br. in Supp. of Defs.' Mot. to Dismiss at 9-10). This Court has not been presented with any evidence that suggests Plaintiff was coerced into signing the LOA or rushed into agreeing to its terms, and two months of deliberative time seems reasonable.

4. *Whether Plaintiff Knew or Should Have Known His Rights*

"A release is more likely to be knowing and voluntary if the employee understood the rights being waived." Riddell v. Med. Inter-Insurance Exch., 18. F. Supp.2d 468, 473 (D.N.J. 1998). Section 16 of the LOA clearly differentiates between the "Types of Claims Waived" and the "Claims not Waived," by explaining that the "General Release of Claims is not intended to prohibit [Plaintiff] from bringing an action to challenge the validity of [Plaintiff's] release of claims under ADEA, if applicable." (Aff. of Jennie Chenault, Ex. A). Plaintiff argues that at the time he executed the LOA, he was "oblivious" to any *claims* of discrimination he had against Defendants and did not discover these claims until after consulting with counsel. (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss at 12). However, Plaintiff does not suggest that he was unaware of the *rights* he maintained by signing the release. The LOA makes a clear reference to Plaintiff's right to file a charge with the Equal Employment Opportunity Commission. (Aff. Jennie Chenault, Ex. A). Rather than exercising his right to sue under the ADEA, Plaintiff chose to bring a NJLAD claim which is waived under the conditions of the LOA as " any other applicable federal, state or local employment discrimination statute, law or ordinance . . ." Id.

5. *Opportunity to Seek Counsel*

Plaintiff does not dispute the fact that the LOA encouraged him to seek the advice of counsel in two different instances. First, Section 21 of the LOA states:

> "[Plaintiff] agree[s] and acknowledge[s] that [Plaintiff's] execution of this Agreement is completely voluntary and that [Plaintiff] ha[s] been advised to consult with an attorney prior to executing this Agreement to ensure that [Plaintiff] fully and thoroughly understands its legal significance."

(Aff. of Sabit Yousef, Ex I, ¶ 21). Secondly, the LOA provides bold, italicized language located

directly above the signature line that cautions the Plaintiff "to discuss the benefits and obligations outlined in this Agreement, including the provision relating to your general release of claims, with an attorney or advisor of your choice."(Aff. of Sabit Yousef, Ex. I). The Court finds that the LOA provided Plaintiff with sufficient encouragement to seek the advice of counsel before executing the release.

      6.  *Opportunity to Negotiate the Terms of the Release*

"The ability to negotiate terms of a release suggest that the atmosphere surrounding its execution was not oppressive and thus indicates a voluntary waiver. (Sauter, at 17.) "The critical consideration, then, is 'whether the employee had an opportunity to negotiate the terms of a release, not whether she actually took advantage of that opportunity.'" Id. at 18. Plaintiff argues that he "was not allowed the privilege of negotiating with the defendants the terms of the waiver" and was given an "ultimatum of either signing the waiver and accept[ing] the terms enforced on him by the defendants or not receiv[ing] any severance." (Pl.'s Br. in Opp'n to Defs.' Mot. to Dismiss at 12). Plaintiff attempts to support his argument by citing Coventry v. U.S. Steel Corp., 856 F.2d 514 (3d Cir. 1988), where the Court invalidated a waiver signed by an employee in consideration for severance payments.  In Coventry, the Court held that the plaintiff did not knowingly and willfully release his rights because his "decision to sign the release was not the result of negotiation between him and his employer and, further, that [Plaintiff] was placed in precisely the 'take it or leave it' predicament . . . " Id. at 524-25.

While the plaintiff in Coventry was given a choice "between a layoff of uncertain duration" and  "an early retirement plan that would make pension benefits available to him only

if he agreed to forgo his rights under the ADEA," (<u>Coventry</u>, 856 F.2d at 524) Plaintiff in the present case was told that in order to receive "severance and outplacement benefits, [Plaintiff] will be required to sign a severance agreement that will contain a general release of claims." (Aff. of Sabit Yousef, Ex. F). The termination notice furthers states that in order for Plaintiff "[t]o remain employed and earn all the benefits noted above, [Plaintiff] will be required to work as scheduled, perform [Plaintiff's] job in a satisfactory manner and work on assigned projects until completed. If [Plaintiff] do[es] not meet these requirements, [Plaintiff's] employment can be terminated for cause and [Plaintiff] will forfeit all severance benefits noted above." <u>Id.</u>  In essence, the purpose of the termination notice was to inform Plaintiff that his position was being eliminated and explain the eligibility requirements for receiving severance benefits.

While the termination notice contains mandatory provisions that require Plaintiff to sign the LOA, Plaintiff was given over two months to review the contents of the LOA with an attorney before executing the release. In <u>Sauter</u>, this Court held that twenty-one days was more than enough time for the plaintiff in that case to "consult[] with legal counsel and . . . to negotiate the terms of the release with her former employer." <u>Sauter</u> at 19. At no point does Plaintiff suggest that he objected to the terms of his severance package, nor does he provide any evidence that COS was unwilling to negotiate the terms of the LOA. Given the length of time in which Plaintiff had to consult with counsel before signing the release, the Court finds that Plaintiff has had sufficient opportunity to negotiate the terms of the release.

7. *Consideration in Return of Waiver*

Finally, the Court finds that in exchange for executing the LOA, Plaintiff received

adequate consideration in the form of twelve months base pay." If the waiver is unsupported by consideration, then it is not enforceable." <u>Sauter</u>, at 19 (citing, <u>Riddell</u>, 18 F.Supp.2d at 474). The LOA states that Plaintiff is to "receive 12 months of [Plaintiff's] regular base pay," which at the time of termination was the $6,666.67 per month for an annual total of $80,000. (Aff. of Sabit Yousef, Ex. I).

Defendants cite to <u>Mullen v. N.J. Steel Corp.</u>, 733 F.Supp. 1534 (D.N.J 1990), where this Court held that the plaintiff's receipt of over $60,000 in exchange for the waiver of his ADEA claim against his employer exceeded the benefits to which the plaintiff was entitled. The Court held that the plaintiff's severance package "totaling in excess of $60,000" was valid consideration because "neither his contract nor law entitled him to." <u>Id.</u> at 1545. Just as in <u>Mullen</u>, Plaintiff in the present case would not have been entitled to the severance benefits afforded to him had it not been for his execution of the LOA. Defendants correctly argue that Plaintiff's decision to accept the benefits of the severance agreement point towards the ratification of the LOA. <u>Mullen</u>, 733 F. Supp. at 1548.  Therefore, the Court finds that Plaintiff received sufficient consideration in exchange for his waiver of claims against COS.

Upon review, the Court finds that each of the factors in the "totality of circumstances" test have been satisfied. As such, the Court finds that Plaintiff knowingly and willfully released his claims against Capital One.

    B. <u>Unused Vacation Days</u>

Plaintiff alleges that Capital One was unjustly enriched by its failure to compensate Plaintiff for his 77 unused vacation and 9 personal days, an amount that Plaintiff alleges totalled

$48,400.00. (Pl.'s Compl. ¶ 13). "An unjust enrichment claim requires plaintiff to allege (1) at plaintiff's expense (2) defendant received benefit (3) under circumstances that would make it unjust for defendant to retain benefit without paying for it." Maniscalco v. Brother Intern Corp., 627 F. Supp. 2d 494, 505 (citing In re K-Dur, 338 F. Supp. 2d at 544 (D.N.J. 2004).

The Court rejects Defendant's argument that Plaintiff's acceptance of over $80,000 in Severance Pay accounts for the compensation promised to Plaintiff's with respect to unused vacation and personal days. (Rep. Br. in Supp. of Def.'s Mot. to Dismiss at 8). The LOA explicitly states in Paragraph 4 that Plaintiff is entitled to "the number of unused vacation days accrued as of [Plaintiff's] Separation Date in accordance with CONA's usual payment practices, less applicable federal, state and local taxes." (Aff. of Sabit Yousef, Ex. I). Furthermore, the "Capital One, N.A. (CONA) Severance and Transition FAQ guide" states in Paragraph 36, "[Terminated Employee] will be paid for any accrued unused vacation/PTO severance." (Aff. of Sabit Yousef, Ex. D ¶ 36). The LOA treats "Severance Pay" and "Unused Vacation Days" as independent obligations and while the Court finds that Plaintiff received adequate consideration in exchange for releasing his claims, the Court also finds that Plaintiff may be owed compensation for the unused vacation and personal days to which he is contractually entitled if he can demonstrate that payment for those days, as specified in the LOA, were withheld..

    C. <u>Timeliness of NJLAD Claim</u>

While Plaintiff's voluntary release of NJLAD claims is sufficient to dismiss the complaint by itself, the Court will address the timeliness of the Plaintiff's claims. "Claims under

the NJLAD are governed by a two-year statute of limitations. Omogbehin v. Dimensions Int'l, Inc., No. 08-3939, 2009 WL 2222927 *3 (July 22, 2009) (citing Montells v. Haynes, 133 N.J. 282, 627 A.2d 654, 660 (N.J. 1993). A limitations period is triggered when an employer "establish[es] its official position and ma[kes] that position apparent to the employee by explicit notice. Omogbehin at 3 (citing Cologan v. Fisher Scientific Co., 935 F.2d 1407, 1416-17 (3d Cir. 1991).

In Wunder v. Katherine Gibbs Sch., No. 09-3497, 2010 WL 2680257 (July 1, 2010), the plaintiff, who suffered from a hearing impairment, had been employed as the Director of Admissions for the Katherine Gibbs School (defendant). In June of 2006, defendant hired a new VP of Admissions to replace Plaintiff in overseeing the department. Id. at *1. In August of 2006, the plaintiff was "informed that his position would soon be eliminated" and in September of 2006, plaintiff was given the option of "either resigning or being terminated." Id. The plaintiff submitted his letter of resignation on September 18, 2006, "which stated that his last day of employment would be October 2, 2006." Id. After filing a discrimination charge with the EEOC, plaintiff received Notice of Right to Sue on March 24, 2008 and subsequently filed a Writ of Summons on October 1, 2008 in the Pennsylvania Court of Common Pleas. Id.

Once the case was removed to the United States District Court for the Eastern District of Pennsylvania, Defendant filed a motion to dismiss arguing that plaintiff's claims were time-barred because the statute of limitations began running the moment plaintiff resigned on September 18, 2006. Id. at 3. The plaintiff argued that the statute of limitations didn't begin to run until October 2, 2006, the date of actual discharge. Id. This Court rejected the plaintiff's

argument that the statute of limitations should be extended to an employee who had "actively pursu[ed] an attempt to amicably resolve his employment situation" during the period between plaintiff's notice of termination and the date of actual discharge. Id. at 4. (citing Bonham v. Dressler Indus., Inc., 569 F.2d 187, 193 (3d Cir. 1977). The Court concluded that the "Defendant's communications to Plaintiff were unambiguous and indicated that his termination was inevitable," and thus granted defendant's motion to dismiss. Id. at 5.

In the present case, Plaintiff relies on an argument similar to the one offered by the plaintiff in Wunder, by requesting that he be given "the benefit of the latest triggering event to establish accrual of his claims." (Pl.'s Br. In Opp'n to Defs.' Mot. to Dismiss at 10). Plaintiff filed this action on February 1, 2011, over two years after receiving the termination notice on December 8, 2008. Plaintiff argues that "the latest triggering event is the termination of the Plaintiff following a transition period where Plaintiff was compelled to provide his services in full when he was able to positively contribute to the benefit of the Defendant." Id. Plaintiff then offers an alternative theory, suggesting that the Defendants "failure and refusal to pay Plaintiff his unused vacation and personal days" could also serve as the latest possible triggering event. Id.

The plaintiff in Wunder was presented with two different options of achieving the same result; termination by resignation or by involuntary discharge. Where the plaintiff in Wunder was given discretion in determining his termination date, Plaintiff in the present case was given precise guidelines and procedural dates for his "transition" towards inevitable termination. Plaintiff was informed that he was to be placed in a sixty-day transition period until his "employment with Capital One, or any of its subsidiaries or affiliates… end[s] on February 5,

16

2009, subject to modification in the sole discretion of Capital One . . ." (Aff. of Sabit Yousef, Ex. F).

The strong language provided in the termination notice was sufficiently clear and unambiguous in notifying Plaintiff that COS fully intended to terminate his employment on February 5, 2009. Furthermore, Covington's subsequent emails following the termination notice all but commanded Plaintiff to "transition [Plaintiff's] clients and prospects into [Jon Trombley's] sales and service force." (Pl.'s Compl. ¶ 46). This Court finds that Plaintiff's receipt of the termination notice on December 8, 2008 triggered the start of the two-year statute of limitations period. Therefore, Plaintiff's claims are barred for failing to file his NJLAD claim within the requisite two-year statute of limitations.

    D.  Amount in Controversy

In light the Court's dismissal of Plaintiff's NJLAD claim, Plaintiff's only remaining claim of unjust enrichment relating to the unused vacation and personal days fails to meet the requisite amount in controversy necessary for the Court to exercise subject-matter jurisdiction over the action.

Pursuant to 28 U.S.C. § 1332:

> The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between:
>
>     (1) citizens of different States;
>
>     (2) citizens of a State and citizens or subjects of a foreign state;
>
>     (3) citizens of different States and in which citizens or subjects of a foreign state are additional parties. . .

"Whenever this subject-matter jurisdiction is absent, the district court must remand the case to the state court when the plaintiff moves to remand or sua sponte." Penn v. Wal-Mart Stores, Inc., 116 F.Supp.2d 557, 561 (D.N.J. 2000). "Even if the parties have not raised the issue, a Court of Appeals should examine its authority sua sponte during its review of the case." Samuel-Bassett v. Kia Motors America, Inc., 357 F.3d 393, 395 (3rd Cir. 2004). The Third Circuit has applied the "legal certainty" test in determining whether the amount in controversy exceeds the statutory minimum. Id. at 398.

The Supreme Court held in Red Cab, 303 U.S. at 288-89 that "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal."

In the instant case, Plaintiff's moving papers identify the amount he is allegedly owed for unused vacation and personal days as $48,400.00. Thus, by Plaintiff's own calculation, the Court can conclude to a legal certainty that Plaintiff's only remaining claim falls short of the statutory amount in controversy required for the Court to exercise subject-matter jurisdiction. It is for that reason that this case must be remanded.

**IV.     CONCLUSION**

For the reasons expressed above, Defendant's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) will be **granted** in part, and the remaining issue will be **remanded** to the Superior Court of New Jersey for further action. An appropriate Order follows this Opinion.

S/ Dennis M. Cavanaugh
DENNIS M. CAVANAUGH, U.S.D.J.

Date:   August   24   , 2011

cc:   All Counsel of Record

   Hon. Mark Falk, U.S.M.J.